*Clk's copy*

IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF NEW MEXICO

LINDA WALKER-TRUETT,       )
                               )
          Plaintiff,     **FILED**   CIV. 97-1707 JP/DJS
                               )
      v.               AT ALBUQUERQUE NM
                               )
RODGERS PLUMBING & HEATING   JAN 1 3 1999   MEMORANDUM OPINION
COMPANY, INC.,                     )
                               )
      Defendant.     ROBERT M. MARCH
                       ) CLERK

---

This matter was tried to the Court on October 28-29,
1998. After careful consideration of the arguments of counsel
and the evidence adduced at trial, the Court makes the following
findings of fact and conclusions of law pursuant to Rule 52(a) of
the Federal Rules of Civil Procedure.

Linda Walker-Truett (Truett), was a former plumber's
helper at Rodgers Plumbing & Heating Co., Inc. ("Rodgers
Plumbing"). Truett filed this action against Rodgers Plumbing,
alleging that she was subject to a sexually hostile working
environment and gender discrimination, in violation of Title VII
of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, and that
Rodgers Plumbing retaliated against her for filing a complaint
with the Equal Employment Opportunity Commission (E.E.O.C.), in
violation of 42 U.S.C. § 2000e-3. Truett also alleged a common
law claim for assault and battery against Rodgers Plumbing.
Rodgers Plumbing argues that none of the acts alleged by Truett
constituted a sexually hostile work environment. Rodgers
Plumbing contends that it cannot be held liable unless it knew of
the harassment, and that as soon as Truett made the owner aware

of the problems, it took appropriate steps to remedy the situation. Rodgers Plumbing further denies that it acted in retaliation to Truett's filing of a complaint with the E.E.O.C. Finally, defendant argues that plaintiff's battery claim is precluded under the New Mexico Worker's Compensation scheme. The Court has jurisdiction pursuant to 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1367.

## I. FACTS

Plaintiff is a caucasian woman, forty-three (43) years of age and a resident of New Mexico. Rodgers Plumbing and Heating is a New Mexico corporation owned by Mr. James Rodgers and his wife. The corporation employs about fifty (50) persons, including the sons of Mr. and Mrs. Rodgers. Jay Rodgers served as Vice President, Philip Rodgers as office manager, and Robert Rodgers as project manager/estimator.

Plaintiff's connection with the defendant Rodgers Plumbing began when Truett worked for defendant from 1986 to 1992 as a delivery person. Four years later, Jim Rodgers, the owner of Rodgers Plumbing, informed Truett that he had a few big jobs beginning and wanted to know if she would be interested in working for him again. Truett expressed interest, but only if she would be making more money than her $6 per hour job. Jim Rodgers told her she would be starting at $7 per hour and Truett filled out an application. Jim Rodgers told Truett that after two weeks of work, the foreman would evaluate her and she might be eligible for a pay raise, possibly earning $8 or $9 per hour

-2-

by the end of the year. Truett began working for Rodgers
Plumbing on October 3, 1996.

As a plumber's helper, Truett performed various tasks
at the job sites, including strapping and insulating. Truett
experienced problems with three other employees at the job site.
Art Lucero (Lucero), a plumber, usually called Truett "honey" and
"sweetie pie." Evidence was presented at trial, however, that
Lucero occasionally referred to other male employees as "honey."
Lucero also patted Truett on the butt on at least one occasion.[1]
Truett did not express offense to this first incident because she
wanted to maintain peace at the work place. The second time,
however, Truett stated to Lucero: "How would you like it if I
hit you?" On another occasion, Lucero wrapped his arms around
Truett while showing her how to place copper lines through holes.
Truett testified that although she was offended by this touching,
she did not think Lucero was touching her in a sexual way on this
occasion (Truett Deposition at 94). Truett also testified that
Lucero told her she acted like a little grasshopper hopping
around from job to job and that she should just marry Robert
Ortiz.

Truett experienced different problems at the job site
with Robert Ortiz, the plumbing foreman. Truett stated that
Robert Ortiz would not allow her to use a power saw to cut boards
needed to perform a strapping operation. Robert Ortiz denied

---

[1] Plaintiff testified to a second occasion, but there were
a group of people present. Mr. Lucero was one, but she did not
see who patted her. She concluded it was Lucero.

this. Donna Thompson testified that when she worked with Robert Ortiz, she regularly used the power saw. Plaintiff also claims that Robert Ortiz yelled at her for not having certain tools, and suggested that her boyfriend buy them for her. She claimed that on one occasion, Robert Ortiz yelled at her for using another employee's tape measure. Truett testified that she was never given much instruction on how to perform tasks, or she was given inconsistent directions. She testified that when she inquired about her job performance, Robert Ortiz told her she was doing fine. At some point during mid-November, 1996, Truett called Jim Rodgers and asked for a meeting as she had some problems at the job site. They agreed to a time when they could meet. However, plaintiff later advised Mr. Rodgers that she was scheduled to bowl on the night the meeting was scheduled, and she would have to cancel the meeting. An effort was made to reschedule the meeting but plaintiff and Rodgers were not able to find an acceptable date. During those conversations, she never identified what the problems were that she wanted to discuss with him. During a conversation in mid-November, she complained to Mr. Rodgers about having to pick up nails from the floor to use for strapping. Every employee, including Donna Thompson, testified that this was common practice -- it saved time as the nails were readily available. During that conversation with Truett, Jim Rodgers explained that using nails lying on the ground was a common practice. Truett further testified that at the time she complained about problems on the job site, Jim

-4-

Rodgers said he might have to give Truett a mechanical ability test. Rodgers denied making such a statement.

Truett also alleged that an incident with a mechanic at Rodgers Plumbing, Edward Johnson (Johnson), created a sexually hostile working environment. On October 29, 1996, around 3 or 4 p.m., Truett was sent to the garage to assist Johnson. Johnson instructed Truett to sort the nuts and bolts by putting them away in their correct drawers. Truett sorted the nuts while standing on a milk crate with her back to Johnson. As she was sorting, the atmosphere was jovial because Johnson and another employee were teasing her about having blond hair. Truett was playing along, saying she did not know where this nut went because she was a blond. After the other employee had left the garage, Truett asked Johnson where a certain nut went, Johnson approached her from behind and put both hands on her rib cage area and tickled her. Truett turned around and faced him. Johnson put both hands on her again to tickle her. His left hand touched her right side and the palm of his right hand touched her left breast. Truett testified that Johnson's hand came up underneath her sweatshirt, pushed up her bra and touched her breast. Johnson denied that his hand was ever underneath her sweatshirt. Johnson immediately backed away and Truett stepped down off the crate. Johnson apologized and told her to check at the front office for other tasks to do. Truett went to the front office where she engaged in a conversation with Jay Rodgers, the Vice President of Rodgers Plumbing. Jay Rodgers testified that Truett

-5-

did not appear to be upset at the time.  A few minutes later, Johnson had finished his duties and joined the conversation.  The conversation eventually broke up and neither Truett nor Johnson mentioned the incident to Jay Rodgers.

The next day, Truett was asked to give Johnson a ride to Phillip Rodgers' house to pick up a vehicle.  Truett did not express any apprehension about giving Johnson a ride.  During the car ride, Johnson asked Truett not to tell anyone about the incident and stated that he wanted to keep their relationship professional.  Truett explained that she did not consider their relationship to be sexual in any way.  After that day, Truett never again worked with Johnson.

Pursuant to Truett's inquiries about a raise, Jim Rodgers had Robert Ortiz evaluate Truett on October 23, 1996. (See Exhibit H).  Robert Ortiz described Truett as a slow, poor worker who was only 50% of a good laborer.  For instance, Truett's strapping work left sagging pipes, and she insulated the wrong pipes.  Jim Rodgers informed Truett of the results of her October evaluations and stated that she would not get a raise.  A second evaluation was scheduled at her request so she could be present.  It was scheduled for October 31, 1996, but Truett failed to show.  Robert Ortiz evaluated her again anyway and again gave her a poor evaluation.  (See Exhibit H).  Although Robert Ortiz evaluated Truett's performance, assigned her tasks and told her where to report for work, Robert Ortiz did not have the authority to fire, demote, discipline, or change the wages of

-6-

any employees. Only Jim Rodgers possessed this authority. As to the evaluations and their use, there was no evidence that plaintiff was treated any differently than any other employee.

On December 6, 1996, two months after beginning with Rodgers Plumbing as a plumber's helper, Truett went to the EEOC office in Albuquerque to file a complaint. The EEOC investigator told her to report the incidents to her employer. Following this advice, she requested to meet with Jim Rodgers on December 6, 1996, and for the first time voiced her complaints to him. When Truett told Jim Rodgers of the incident with Johnson, Jim Rodgers called Johnson into the lunch room. Johnson admitted inappropriately touching Truett and violating the company's policy prohibiting horseplay. Johnson again apologized to Truett at this meeting. A further meeting between plaintiff and Jim Rodgers was scheduled for Monday, December 9, 1996, at 4:00 p.m. to address Truett's complaints. Rodgers testified that Truett did not mention the incidents involving Art Lucero at this meeting, except that Lucero called her "honey" and "sweetie pie."

On Monday, December 9, 1996, Truett reported to her usual job site at 7:00 a.m. Jim Rodgers called out to that job site and asked her to come to the office. Jim Rodgers told Truett she would be re-assigned to a different job site and would be working with Donna Thompson (Thompson). Truett inquired what would be done regarding Ed Johnson and that he had to take immediate action against Johnson. Jim Rodgers asked Truett what she wanted done. Truett said she wanted compensation. When Jim

-7-

Rodgers inquired if Truett was seeking a monetary award, Truett responded that she wanted justice, as much as the law allows. Jim Rodgers replied that he would not let her take his business from him.

Truett testified that at this new job site, she was required to use heavy equipment which she did not feel comfortable operating. Truett began experiencing a migraine headache and left work that day at the end of the morning. Truett testified she worked a total of about two and one-half hours with Thompson. Thompson testified that plaintiff worked about four hours that morning.

Truett returned to the office around 4:00 p.m. that Monday for the scheduled meeting. At the meeting, Jim Rodgers talked with Truett and had her write down all her complaints. As part of his investigation, he had Robert Ortiz and Santana Ortiz, a plumber who acted as the plumbing foreman in Robert Ortiz's absence, complete a written evaluation of Truett. Robert Ortiz stated that he was not aware of Truett's sexual harassment claims at this time. Robert Rodgers, a project manager and Jim Rodgers' son, was in the room and showed the evaluation results to Truett. Both Robert and Santana Ortiz had given Truett a score of 16 out of a possible 60. (Exhibit P-2). Truett was upset and called them liars. As Truett was leaving this meeting, Jim Rodgers told her to be there at 8:00 a.m. the next morning to be evaluated by four of her fellow employees, Donna Thompson, Art Lucero, Eduardo Lira, and Oscar Valenzuela. Jim Rodgers explained the reason for

-8-

these co-worker evaluations was to determine if there was a personal conflict between Truett and Robert Ortiz which might explain his poor evaluation of her. Jim Rodgers placed Truett on the work schedule for that workweek, but Truett never reported back to work at Rodgers Plumbing after December 9, 1996. On the morning of the 10th, Thompson, Lucero, Lira and Valenzuela evaluated plaintiff. All four evaluations awarded her a score ranging from 14-17 out of a possible 60. (Exhibit P-2).

Rodgers Plumbing distributed a sexual harassment policy around December 10, 1996. Prior to this written policy, the company had a non-written policy which prohibited sexual harassment. The company did not tell newly-hired employees about this policy, but it did provide some training by consultants to inform new employees of OSHA laws and this consultant talked about sexual harassment once or twice a year.

On December 20, 1996, Jim Rodgers called Johnson into the office and issued him a written reprimand. (Exhibit P-4). Johnson read it and signed it. Jim Rodgers told Johnson that he could not have such behavior occurring at his company. Jim Rodgers also orally instructed Lucero not to inappropriately touch other employees or call them "honey" or "sweetie pie." Since then, Jim Rodgers has not received any complaints about either Lucero or Johnson's conduct.

As a result of these incidents at Rodgers Plumbing, Truett alleges that she suffered headaches, nausea, hives and anxiety attacks. Defendant contends that some of Truett's

-9-

conditions arose from her personal problems, especially her
filing for divorce from her third husband on November 27, 1996.
After she left Rodgers Plumbing on December 9th, Truett sought
employment at a pre-school where she is currently employed.   She
started there at $5 per hour, and presently earns approximately
$6.40 per hour.

## II.   DISCUSSION

### A.   Hostile Work Environment

Title VII of the Civil Rights Act of 1964 makes it an
"unlawful practice for an employer . . . to discriminate against
any individual with respect to his compensation, terms,
conditions, or privileges of employment, because of such
individual's race, color, religion, sex, or national origin."   42
U.S.C. § 2000e-2(a)(1).   Title VII is violated where unwelcome
conduct based on sex creates a hostile or abusive environment.
*Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986).   For
sexual harassment to be actionable, it must be sufficiently
severe or pervasive "to alter the conditions of [the victim's]
employment and create an abusive working environment.   *Meritor*,
477 U.S. at 67; *Adler v. Wal-mart Stores, Inc.*, 144 F.3d 664, 672
(10th Cir. 1998).   A plaintiff may establish the existence of a
hostile working environment if either the asserted harassment was
pervasive or if there was only a single incident of harassment
which, standing alone, was sufficiently severe.   *Creamer v.
Laidlaw*, 86 F.3d 167, 170 (10th Cir. 1996).

To establish a sexually hostile work environment, a plaintiff must prove the following elements: (1) she is a member of a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on sex; and (4) the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment. *Seymore v. Shawver & Sons, Inc.*, 111 F.3d 794, 797 (10th Cir. 1997). Whether an environment is "hostile" or "abusive" can be determined only by looking at the totality of the circumstances, which may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 371 (1993). A hostile work environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim perceived to be hostile or abusive. *Harris,* 510 U.S. at 21-22. The Court must consider these factors when determining whether Johnson's, Lucero's, and Robert Ortiz's conduct, singly or collectively, was sufficiently severe or pervasive to create a hostile working environment. The alleged discriminatory incidents must be examined in light of the record as a whole, not in isolation or by a mechanical elimination of each incident as not constituting a hostile working environment. *Penry v. Federal Home Loan Bank of Topeka*, 155 F.3d 1257, 1262 (10th Cir. 1998).

Conduct need not be overtly sexual in nature to constitute a hostile working environment; rather, the conduct must be such that it would not have occurred but for the sex of the employee. *Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1537 (10th Cir. 1995) (citing *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1415 (10th Cir. 1987)). Where "the nature of an employee's environment, however unpleasant, is not due to her gender, she has not been the victim of sex discrimination as a result of that environment." *Id.* Lucero's references to Truett as "honey" and "sweetie pie," although not overtly sexual, could be sexual in nature if they were uttered based only upon the plaintiff's gender. *Winsor v. Hinckley Dodge, Inc.*, 79 F.3d 996, 1000-1001 (10th Cir. 1996). Because Lucero referred to male employees as "honey," it does not appear that Lucero's name-calling was based upon the plaintiff's gender.

Plaintiff also complains that Robert Ortiz's conduct of refusing to allow her to use a power saw, instructing her to pick up nails from the ground and criticizing her for using another employee's tools constitute a hostile work environment. However, another female employee testified that while under Ortiz's supervision she was allowed to use a power saw and she picked up nails off the ground because it was convenient. This suggests that even if plaintiff's allegations are true, the acts by Robert Ortiz were not conduct based on plaintiff's gender, and therefore, cannot constitute a hostile work environment. Moreover, since plaintiff was required to furnish tools as part

-12-

of her job description, this Court does not believe that Ortiz's criticisms of plaintiff for using another employee's tools occurred because of plaintiff's gender. The Court finds that these actions, even if true, do not constitute sexual harassment or create a gender-related hostile work environment.

Lucero also put his arms around plaintiff while demonstrating a task. Generally, "isolated incidents of harassment, while inappropriate and boorish, do not constitute pervasive conduct." *Smith v. Northwest Financial Acceptance*, 129 F.3d 1408, 1414 (10th Cir. 1997). This conduct by Lucero appears to have been inadvertent and not pervasive. The same might be said of Lucero patting Truett on the buttocks. However, "the word 'pervasive' is not a counting measure." *Id*. Thus, even though these incidents occurred infrequently, a single incident of hitting a female employee's buttocks along with a threat to repeat the conduct has been held sufficiently severe to constitute a sexually hostile working environment. *See Campbell v. Kansas State University*, 780 F.Supp. 755, 762 (D.Kan. 1991). Johnson's physical contact with Truett's breast, whether under her clothing or not, while not pervasive, constitutes an action which is greater in severity. *See Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430-31 (7th Cir. 1995) (explaining that sexual assaults; *other physical contact, whether amorous or hostile, for which there is no consent*; uninvited sexual solicitations; and intimidating words or acts; obscene language or gestures; and pornographic pictures, fall on the side of a fine line which

-13-

indicates conduct sufficient to constitute a sexual harassment)
(emphasis added). The Court concludes that after considering the
*Harris* factors in light of the whole record, the alleged
discriminatory incidents involving Lucero's and Johnson's
conduct, taken together are sufficient to constitute a hostile
work environment.

### 1. Employer Liability[2]

Once the plaintiff has established the existence of a
hostile work environment, the next question is whether the
employer can be held liable for the harassing conduct.
Responding to the considerable confusion among the circuit and
district courts concerning the standards governing employer
liability under Title VII for sexual harassment, the Supreme
Court attempted to clarify this issue in its twin opinions of
*Faragher v. City of Boca Raton*, ___ U.S. ___, 118 S.Ct. 2275, 141
L.Ed.2d 662 (1998), and *Burlington Indus. v. Ellerth*, ___ U.S.
___, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). These cases
established that an employer is subject to vicarious liability
for hostile-environment sexual harassment created by a supervisor
with immediate, or successively higher, authority over the
employee. *Faragher*, 118 S.Ct. at 2292-93; *Ellerth*, 118 S.Ct. at
2270. However, while *Faragher* and *Ellerth* discussed liability

---

[2] Plaintiff provides case law suggesting that an individual
defendant may be held liable for assaults on the job. However,
District Court Judge James A. Parker previously dismissed the
individual defendants from this action in an order filed on
August 19, 1998. Therefore, the issue of whether plaintiff can
hold individual employees at Rodgers Plumbing liable is no longer
before this court.

standards for harassment by the plaintiff's supervisor, they did not address liability for harassment by co-workers. *Edwards v. State of Connecticut Dept. of Transportation*, 18 F.Supp.2d 168, 177 (D.Conn. 1998). Several courts in decisions following these cases have determined that the new standards for employer liability set forth by the Supreme Court are inapplicable in cases of co-worker harassment. *Ward v. West*, 1998 WL 778053 at *3 n.3 (N.D.Ill. 1998); *Ponticello v. Zurich American Ins. Group*, 16 F.Supp.2d 414, 430 (S.D.N.Y. 1998); *Henderson v. Whirlpool Corp.*, 17 F.Supp. 2d 1238, 1244 n.4 (N.D.Okla. 1998). *But see Coates v. Sundor Brands, Inc.*, 160 F.3d 688, 1998 WL 789169 (11th Cir. 1998) (applying the Supreme Court's affirmative defense in a case involving co-worker harassment).

Thus, the Supreme Court's new guidance has exalted the issue of supervisory status into the forefront of a plaintiff's hostile environment claim against her employer. *Grozdanich v. Leisure Hills Health Center, Inc.*, ___ F.Supp.2d ___, 1998 WL 765654 at *14 (D. Minn. 1998). The point at which a co-worker becomes a supervisor is not always clear. *Corcoran v. Shoney's Colonial, Inc.*, ___ F.Supp. 2d ___, 1998 WL 744495 at *4 (W.D.Va. 1998). The Court in *Faragher* and *Ellerth* simply mentioned a supervisor being a person who has immediate or successively higher authority over the employee. *Id.* In *Faragher*, the supervisors were responsible for the plaintiff's daily assignments, supervising her work, and supervising her fitness training. *Id.* The supervisor in *Ellerth* was a mid-level manager

-15-

with authority to hire and promote employees subject to the approval of his supervisor. *Id.* In *Ellerth*, the Court alluded to some relevant characteristics of a supervisor, when discussing "tangible employment action," as the ability to dock another employee's pay or to demote another employee, i.e. to make economic decisions affecting other employees under his or her control. *Ellerth*, 118 S.Ct. at 2269. This Court concludes that the evidence presented at trial reveals that Johnson and Lucero were Truett's co-workers. While it is possible that Robert Ortiz might have been considered plaintiff's supervisor, the Court has already determined that none of his actions constitute sexual harassment or created a gender-related hostile work environment. Even if it is presumed that Lucero and Johnson were Truett's supervisors, Rodgers Plumbing would not be liable under the standards announced in *Faragher* and *Ellerth* since defendant took no tangible employment action against Truett,[3] and the defendant may rely on the affirmative defense, articulated in *Faragher*, 118 S.Ct. at 2293 and *Ellerth*, 118 S.Ct. at 2270. This defense comprises two necessary elements which the employer must establish by a preponderance of the evidence:

> (a) the employer exercised
> reasonable care to prevent and
> correct promptly any sexually
> harassing behavior, and (b) that
> the employee unreasonably failed to

---

[3] A "tangible employment action" is a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 118 S.Ct. at 2268.

-16-

> take advantage of any preventive or
> corrective opportunities provided
> by the employer or to avoid harm
> otherwise.

*Id.* First, defendant exercised reasonable care to prevent and correct promptly any sexually harassing behavior. No evidence was presented demonstrating why defendant should have been aware of any sexually harassing conduct occurring at his workplace prior to December 6, 1996. When plaintiff did report the conduct, defendant took appropriate action to correct the situation. Second, the evidence at trial also demonstrates that Truett unreasonably failed to take advantage of any preventive or corrective opportunities provided by Rodgers Plumbing. On December 6, 1996, defendant began an investigation into plaintiff's complaints. Plaintiff quit her job a few days later before allowing defendant time to finish its investigation and take remedial action. A few weeks later, defendant did in fact take remedial action by issuing a letter of reprimand to Ed Johnson and telling Lucero to change his conduct. Thus, defendant has established this affirmative defense by a preponderance of the evidence.

The Court will not consider defendant's liability under the standards applied when the harassment is created by fellow employees, rather than supervisors. Decisions following *Faragher* and *Ellerth* have presumed that existing circuit case law on the subject of employer liability for harassment by co-workers was left intact. *Edwards*, 18 F.Supp.2d at 177; *Henderson*, 17 F.Supp.2d at 1244 n.4.

The Supreme Court in *Meritor* first held that in order to determine whether an employer is liable for a hostile work environment, the court must look to general agency principles. Analyzing the Restatement (Second) of Agency § 219, the Tenth Circuit identified three bases for holding an employer liable: (1) if the conduct violating Title VII occurred within the transgressor's scope of employment; (2) if the employer knew, or should have known about, the violation and failed to respond in a reasonable manner; or (3)[4] if the transgressor acted with apparent authority or was aided in violating the statute by virtue of their agency relationship with the employer. *Wright-Simmons v. City of Oklahoma City*, 155 F.3d 1264, 1269-70 (10th Cir. 1998) (involving supervisor harassment). In the present case, Truett alleges that she may hold Rodgers Plumbing liable under the first basis regarding scope of employment, or in the alternative, the second basis stating the "knew or should have known" standard.

In cases regarding employer liability for harassment by supervisors, the Tenth Circuit has recognized that the scope-of-employment basis is "largely inapplicable to harassment cases except in the fanciful case that the employer had made such illegal harassment part of the employee's job description." *Wright-Simmons v. City of Oklahoma City*, 155 F.3d 1264, 1270

---

[4] Based on *Faragher* and *Ellerth*, the Tenth Circuit in a case involving supervisor harassment has rejected this third basis of employer liability regarding apparent authority. *See Harrison v. Eddy Potash, Inc.*, ___ F.3d ___, 1998 WL 758401 at *4 (10th Cir. 1998)

(10th Cir. 1998) (citing *Hicks v. Gates Rubber Co.*, 833 F.2d
1406, 1417-18 (10th Cir. 1987)). *Accord Ellerth*, 118 S.Ct. at
2267. That rule would be equally applicable in a case such as
this involving co-workers. However, no such evidence exists in
this case.

In a Tenth Circuit case decided before *Faragher* and
*Ellerth*, the court stated that where the plaintiff is subject to
harassment by her peers rather than by her supervisors, the *only*
basis for liability is Restatement (Second) Agency § 219(2)(b),
which contains a negligence standard and correlates to the Tenth
Circuit's second enumerated basis for employer liability. *Adler*,
144 F.3d at 683 (emphasis added); *Wright-Simmons v. City of
Oklahoma City*, 155 F.3d 1264, 1269-70 (10th Cir. 1998). *See also
Edwards*, 18 F.Supp.2d at 177; *Distasio v. Perkin Elmer Corp.*, 157
F.3d 55, 63 (2nd Cir. 1998); *Williamson v. City of Houston*, 148
F.3d 462, 465 (5th Cir. 1998). Thus, employer liability for
sexual harassment by an employee's co-workers attaches when "its
management level employees, agents, or supervisory employees knew
or should have known of the harassment and failed to take prompt
and effective remedial measures." *Adler*, 144 F.3d at 683; 29
C.F.R. § 1604.11(d); *Faragher*, 118 S.Ct. at 2289 (citations
omitted); *Hirase-Doi v. U.S. West Communications, Inc.*, 61 F.3d
777, 783 (10th Cir. 1995) (applying the "knew or should have
known" negligence standard in determining the employer's
liability for harassment by a co-employee); *Jeffries v. State of
Kansas*, 147 F.3d 1220, 1229 (10th Cir. 1998) (same); *Davis v.*

-19-

*United States Postal Service*, 142 F.3d 1334, 1342 (10th Cir. 1998) (same).

### a. Knowledge

Under the negligence theory of employer liability, the plaintiff must establish that the employer had actual or constructive knowledge of the hostile work environment but did not adequately respond to notice of the harassment. *Adler*, 144 F.3d at 673. Actual knowledge will be demonstrable in most cases where the plaintiff has reported harassment to management-level employees. *Id.* In the present case, Truett reported the incidents of harassment by Johnson and Lucero to the owner of the company, Jim Rodgers, but not until December 6, 1996. There is no evidence supporting a finding that Jim Rodgers had actual or constructive knowledge of these incidents or any claim of sexual harassment prior to December 6, 1996.

### b. Appropriate Remedial Action

Under the negligence standard, the question then becomes whether the employer took prompt and effective remedial action once it knew of the harassing conduct. In determining whether the employer's response was adequate, the test in the Tenth Circuit is whether the remedial action was "reasonably calculated to end the harassment." *Adler*, 144 F.3d at 676 (citing *Ellison v. Brady*, 924 F.2d 872, 882 (9th Cir. 1991)). Courts have generally held that simply informing the harasser of the existence of a policy against harassment is insufficient. *Adler*, 144 F.3d at 676. "[R]esponses that have been held

-20-

reasonable have often included prompt investigation of the allegations, proactive solicitation of complaints, scheduling changes and transfers, oral or written reprimands, and warnings that future misconduct could result in progressive discipline, including suspension and termination." *Id.* In the present situation, the employer began to take appropriate action the very day plaintiff reported the incidents. On Friday, December 6, 1996, Jim Rodgers began an investigation by calling Johnson into the office and confronting him with Truett's allegations. Jim Rodgers scheduled a meeting with plaintiff to further address her complaints the following Monday, December 9, 1996. First thing Monday morning he transferred plaintiff to a different job site, shielding plaintiff from the employees allegedly engaging in the harassing conduct. *See Buchanan v. Sherrill*, 51 F.3d 227, 229 (10th Cir. 1995) (recognizing that transferring the plaintiff to another location could be reasonably calculated to end the harassment). Jim Rodgers had plaintiff's co-workers evaluate her to detect if there were personality conflicts between plaintiff and Robert Ortiz. Jim Rodgers distributed a copy of his company's sexual harassment policy to all employees that same week. After further investigation, Jim Rodgers issued Johnson a written reprimand, explaining that sexual harassment would not be tolerated and any future allegations of sexual harassment against him could result in suspension or termination. (See Exhibit P-4). Jim Rodgers additionally told Lucero to refrain from inappropriate touching or name-calling. "Title VII does not

-21-

require that an employer use the most serious sanction available to punish an offender, particularly where, as here, this was the first documented offense by an individual employee." *Landgraf v. USI Film Products*, 968 F.2d 427, 430 (5th Cir. 1992). Jim Rodgers has received no complaints about Johnson or Lucero since this time. Whether the employer's action stops the harassment is one factor to be considered in evaluating whether the remedial action was reasonably calculated to end the harassment. *Adler*, 144 F.3d at 676. The Court concludes that the remedial actions taken by Rodgers Plumbing were adequate and effective. Accordingly, Rodgers Plumbing is not liable under Title VII for any hostile work environment created by its employees.

## B. Gender Discrimination

Truett also alleges that she was the subject of gender discrimination and disparate treatment by defendant with respect to terms, conditions and privileges of her employment due to her sex. A plaintiff must exhaust her administrative remedies before bringing suit under Title VII. *Aramburu v. The Boeing Co.*, 112 F.3d 1398, 1409 (10th Cir. 1997). The suit may include claims which are reasonably related to the allegations contained in the administrative charge, but not claims which are beyond the scope of the EEOC charge. *Id.*; *Brown v. Hartshorne Public School District No. 1*, 864 F.2d 680, 682 (10th Cir. 1988). In her Charge of Discrimination filed with the EEOC, Truett stated that she "was sexually harassed," and that she believed she was "discriminated against by being sexually harassed." In her

-22-

affidavit accompanying this charge, Truett specifically mentioned
the incident with Ed Johnson on October 29, 1996, where he
touched her breast.  In her Charge Questionnaire, Truett states
that the situation she was "most concerned with is sexual
harassment by another employee who grabbed my left breast. . . ."
Thus, Truett's charge to the EEOC was generally a charge alleging
a sexually harassing, hostile working environment, despite the
fact that plaintiff checked the box entitled discrimination based
on "sex" on her EEOC charge.  "Most courts have concluded that a
claim for discriminatory treatment and a claim for harassment are
not sufficiently similar to allow a charge for one to support a
complaint that includes the other."  4 Lex K. Larson, *Employment
Discrimination* § 76.06[1][c] (2d ed. 1998).  *See also Van
Jelgerhuis v. Mercury Finance Co.*, 940 F.Supp. 1344, 1354-55
(S.D.Ind. 1996) (holding that plaintiffs' charge to the EEOC
which pointed to a claim of hostile work environment was not
reasonably related to the disparate treatment claim plaintiffs
sought to pursue in the law suit because the EEOC charge made no
reference to the disparate treatment practices they now seek to
redress); *Honea v. SGS Control Servs. Inc.*, 859 F.Supp. 1025,
1030 (E.D.Tex. 1994) (recognizing the Fifth Circuit's conclusion
that claims for disparate treatment and sexual harassment are
distinct theories) (citing *Clark v. Kraft Foods, Inc.*, 18 F.3d
1278, 1279 n. 4 (5th Cir. 1994)).  *See also Sandom v. Travelers
Mortgage Servs., Inc.*, 752 F.Supp. 1240, 1247-48 (D.N.J. 1990)
(dismissing the plaintiff's added claim for sexual harassment

because it was not reasonably related to the EEOC charges which alleged sexual discrimination); *Emmons v. Rose's Stores, Inc.*, 5 F.Supp.2d 358, 363 (E.D.N.C. 1997) (same).

Plaintiff contends that she was subject to gender discrimination because she was assigned tasks that she had no job skills or training to perform, that she was denied the use of certain tools, which were necessary to perform her job, that she was required to scavenge the job site for nails, that she was called "honey" and "sweetie pie" by a co-worker, that she was tickled by a co-worker, that she was subject to evaluations by her co-workers, and that she was not informed of the results of her evaluations. Truett failed to allege in her EEOC charge any specific conduct which she now argues forms the basis of her gender discrimination claim. *See Cheek v. Peabody Coal Co.*, 97 F.3d 200, 202-203 (7th Cir. 1996) (holding that plaintiff was precluded from asserting her sexual harassment claim because the harassers and the harassing conduct fell outside the scope of her EEOC charge, which only asserted facts based on a disparate treatment claim); *Cheek v. Western and Southern Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994) (stating that "Because an employer may discriminate on the basis of sex in numerous ways, a claim of sex discrimination in an EEOC charge and a claim of sex discrimination in a complaint are not alike or reasonable related unless there is a factual relationship between them."). Accordingly, Truett has failed to exhaust her administrative remedies with regard to her gender discrimination claim, and the

-24-

court will grant defendant's Fed. R. Civ. Pro. 52(c) motion for judgment as a matter of law on the gender discrimination claim, which was raised after the plaintiff's case was presented at trial and renewed in closing arguments.

## C. Constructive Discharge

A plaintiff asserting a claim of constructive discharge must produce evidence that the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign. *Thomas v. Denny's, Inc.*, 111 F.3d 1506, 1514 (10th Cir. 1997). In other words, the plaintiff must allege facts sufficient to demonstrate under an objective test that a reasonable person would have viewed her working conditions as intolerable. *Jeffries*, 147 F.3d at 1233. An employee who resigns of her own free will, even as a result of the employer's action, cannot be said to have been constructively discharged. *Id.* Truett effectively resigned from her job at Rodgers Plumbing only a few days after she informed her employer of her complaints. Jim Rodgers was in the process of investigating her complaints and taking action to correct the situation at his company. This Court does not believe that a reasonable person would have viewed plaintiff's working conditions as so intolerable that she was compelled to resign.

## D. Retaliation

Title VII prohibits retaliation against an employee because he or she has made a charge against her employer for an

unlawful employment practice. 42 U.S.C. § 2000e-3(a). To
demonstrate a retaliation claim, a plaintiff must make out a
prima facie case: (1) protected opposition to discrimination or
participation in a proceeding arising out of discrimination; (2)
adverse action by the employer; and (3) a causal connection
between the protected activity and the adverse action. *Gunnell
v. Utah Valley State College*, 152 F.3d 1253, 1262-63 (10th Cir.
1998); *Jeffries v. State of Kansas*, 147 F.3d 1220, 1231 (10th
Cir. 1998). If the plaintiff established a prima facie case, the
burden of production shifts to the defendant to produce a
legitimate reason for its action. *Id.* at 1231. The plaintiff
may still prevail if she demonstrates that the legitimate reason
offered by the defendant was a pretext. *Id.*

It is undisputed that plaintiff engaged in a protected
activity. The first requirement is, therefore, met. With
respect to the second element, an "adverse employment action" has
generally been defined as an action which alters the terms or
conditions of the plaintiff's employment. *Bennett v. Henderson*,
15 F.Supp.2d 1097, 1113 (D.Kan. 1998). "[N]ot everything that
makes and employee unhappy is an actionable adverse action." *Id.*
Unlike some of the other circuits, the Tenth Circuit does not
require that the action *materially* alter the terms or conditions
of employment. *Jeffries,* 147 F.3d at 1232 (emphasis added).
Rather, determining whether a given employment action is
"adverse" requires case-by-case consideration. *Id.* Examples of
actionable adverse employment actions include disciplinary

demotion, termination, unjustified evaluations and reports, loss
of normal work assignment, and extension of a probationary
period. *Bennett,* 15 F.Supp.2d at 1113. The Tenth Circuit
liberally defines adverse employment action in recognition of the
remedial nature of Title VII. *Jeffries*, 147 F.3d at 1232.

Plaintiff claims that within one business day after
plaintiff advised defendant that she was filing charges with the
EEOC, plaintiff was subjected to, and received, a number of
unscheduled and unfavorable evaluations, which would not normally
have been done in the routine course of her employment.
Plaintiff has failed to demonstrate that her employer took any
adverse employment action against her. It has been noted that
"[t]here is little support for the argument that negative
performance evaluations alone can constitute an adverse
employment action." *Merriweather v. Alabama Dept. of Public
Safety*, 17 F.Supp.2d 1260, 1275 (M.D.Ala. 1998) (citing *Smart v.
Ball State Univ.*, 89 F.3d 437, 442 (7th Cir. 1996)). In any
event, plaintiff's employer presented legitimate reasons for
conducting co-worker evaluations after Truett filed a complaint,
namely to investigate if there was a personality conflict between
Truett and her foreman, Robert Ortiz. Accordingly, the Court
finds that the evidence does not establish that defendant took
retaliatory action against plaintiff.

## E.  Assault & Battery

Plaintiff also alleges that she was intentionally
battered and assaulted by employees of defendant, that defendant

received a benefit from the assault and battery and therefore,
defendant is liable for the assault and battery committed by its
employees. Defendant claims that the tort claims are barred
under the exclusivity provision of the New Mexico Worker's
Compensation Act. The New Mexico Worker's Compensation Act (WCA)
provides exclusive remedies for disabling injuries incurred in
the work place. N.M. Stat. Ann. § 52-1-8. However, if an injury
does not fall within the coverage formula of the WCA, the
exclusivity provisions do not preclude recovery other than under
the WCA. Courts have generally held that in cases where
plaintiffs seek damages for sexual harassment such as lost wages,
mental distress or humiliation, the exclusiveness clause does not
apply. 2 Arthur Larson, Larson's Worker's Compensation
§ 68.34(d) (Desk Edition 1998). The reasoning is that worker's
compensation covers actions which are related to employment and
the harassment is not employment-related. In order to recover
under the WCA, a claimant must have suffered an injury arising
out of the claimant's employment. *Cox v. Chino Mines/Phelps
Dodge*, 850 P.2d 1038, 1040 (N.M.Ct.App. 1993). To establish that
an injury arises out of employment, it is not sufficient that the
injury occurs at work; the disability must have resulted from a
risk incident to the work itself or increased by the
circumstances of employment. *Id.* Sexual harassment is not a
regular incident of the employment. *Id.* at 1041. Thus, sexual
harassment claims are not covered under the WCA. *Id.* Rather,
the way to maintain public policies against sexual harassment on

the job is to pursue the common-law or statutory remedies available to promote these policies, such as the New Mexico Human Rights Act (NMHRA). *Id*. at 1041-42. At least one New Mexico court has held that a claim of sexual discrimination under the NMHRA where the plaintiff alleged physical and psychological injuries as the result of a sexual assault by her supervisor was not precluded by the WCA because the underlying injuries were outside the WCA. *Sabella v. Manor Care, Inc.*, 915 P.2d 901, 906 (N.M. 1996). There is no question that the WCA does not as a matter of law prevent the plaintiff from recovering her damages associated with her *sexual harassment hostile work environment* claim. *Id*.

However, in the present case, the defendant raised the defense of the exclusiveness clause only as to the intentional tort claims of assault and battery. Where the essence of the wrong involves physical or personal injury, the action against the employer will be precluded by the exclusiveness clause of the WCA. *Sabella*, 915 P.2d at 905-906; Larson, *supra*, § 68.34(d). Realistically, to the employer, it is just one more industrial mishap in the factory, of the sort he has a right to consider exclusively covered by the compensation system. *Id*. at § 68.21(b). Thus, when the person who intentionally injures the employee is not the employer in person . . . but merely a foreman, supervisor or manager, both the legal and the moral reasons for permitting a common-law suit against the employer collapse, and a substantial majority of modern cases bar a damage

suit against the employer. *Id.* at § 68.21(a). Thus, an employer cannot be held vicariously liable under a common-law damages suit for an injury to the employee created by another employee, unless there was an actual intent to injure on the part of the employer. *Gallegos v. Chastain*, 642 P.2d 60, 63 (N.M. Ct. App. 1981). *See also Martin-Martinez v. 6001, Inc., d/b/a T.D.'s Showclub*, ___ P.2d ___, 1998 WL 864595 at *4 (N.M.Ct.App. 1998). Thus, there is an exception to the exclusivity rule when the employer has commanded or expressly authorized the assault, i.e., the employer has an intent to injure the employee. Larson, *supra*, at § 68.23. In such a situation, a damages suit under common-law will be allowed against the employer for the intentional tort. In the present case, no evidence was presented that defendant had an actual intent to injure Truett. Accordingly, Truett's claim attempting to hold defendant liable for the assault and batteries of its employees is precluded by the Worker's Compensation Act.

### III. CONCLUSION

Accordingly, the Court finds for the defendant and against plaintiff and finds that plaintiff's complaint should be dismissed. A separate order will be entered in accordance with this memorandum opinion.

DATED this 29ᵗʰ day of December, 1998.

BY THE COURT:

LYLE E. STROM, Senior Judge
United States District Court

-30-